THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PUGET SOUNDKEEPER ALLIANCE, et al.,

Plaintiffs,

v.

ANDREW WHEELER, et al.,

Defendants,

and

AMERICAN FARM BUREAU FEDERATION; AMERICAN FOREST & PAPER ASSOCIATION; AMERICAN PETROLEUM INSTITUTE; AMERICAN ROAD AND TRANSPORTATION BUILDERS ASSOCIATION; LEADING BUILDERS OF AMERICA; NATIONAL ALLIANCE OF FOREST OWNERS; NATIONAL ASSOCIATION OF HOME BUILDERS; NATIONAL ASSOCIATION OF MANUFACTURERS; NATIONAL CATTLEMEN'S BEEF ASSOCIATION; NATIONAL CORN GROWERS ASSOCIATION; NATIONAL MINING ASSOCIATION; NATIONAL PORK PRODUCERS COUNCIL; NATIONAL STONE, SAND AND GRAVEL ASSOCIATION; PUBLIC LANDS COUNCIL; and U.S. POULTRY & EGG ASSOCIATION,

Intervenor-Defendants.

No. 2:15-cv-01342-JCC

**INTERVENOR-DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR: June 28, 2019**

ORAL ARGUMENT REQUESTED

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

Plaintiffs fail to refute the showing of the United States and business intervenors' that plaintiffs' claims are not justiciable and, even if they were, lack any merit. Plaintiffs fail to show that they have standing, fail to show that their challenge to the agencies' forty-year-consistent position is timely, and fail to explain how their position makes even the slightest sense as a legal or practical matter. In a case that will soon become moot due to the Agencies' forthcoming rulemaking, they nevertheless ask this Court to enjoin a four-decade-tested approach that protects the Nation's waters. This Court should deny plaintiffs' motion and grant summary judgment to the business intervenors and agency defendants.

Perhaps most telling, plaintiffs largely ignore the comprehensive regulatory scheme within which the WTS exclusion works, barely mentioning the Clean Water Act's Section 402 and 404 permitting programs. Yet those programs work seamlessly with the WTS exclusion to protect waters of the United States (WOTUS). Belying plaintiffs' claim that the CWA prohibits any construction of a WTS in a WOTUS, the Section 404 permitting system allows exactly that, subject to searching inquiry before a permit is issued, opportunity for all interested parties to participate in the permitting process, and stringent permit conditions that must be satisfied on pain of substantial civil or even criminal penalties. Indeed, Section 404 contemplates that dredge and fill material may be used to *completely* fill a WOTUS (for example, by constructing a building full of waste treatment equipment), contradicting plaintiffs' view that water quality standards within a WTS must be maintained regardless of how permitting or exclusions apply. *See* Dkt. 72, at 20-21 (citing authority); Dkt. 79, at 24. And regardless of whether a Section 404 permit was needed for the original construction of a WTS, Section 402 NPDES permits are required to discharge material from a WTS to a WOTUS, ensuring that waters are protected. It is no surprise then that the WTS exclusion has been in existence through seven presidential administrations and has been judicially upheld, because in combination with the rigorous Section 402 and 404 permitting schemes, it works to enable industrial and commercial enterprises to treat their waste water *and* protect water quality. *See Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177 (4th Cir. 2009).

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

Indeed, sometimes constructing a WTS in a WOTUS is the *only* technologically and economically feasible way to treat discharges so as to prevent environmental harm. *See* Dkt. 73, at ¶¶ 7-8; *cf. Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 269 (2009) (using lake as part of mine tailings treatment system prior to downstream discharge was "the 'least environmentally damaging practicable' way to dispose of" the tailings).

Plaintiffs' challenge to a regulatory regime that comports with the CWA, lies within the agencies' expert authority, and protects the Nation's waters fails on procedural and substantive grounds.

**A. Plaintiffs lack standing**

Plaintiffs cannot refute the showings by the agencies and intervenors that their claims are too generalized and speculative to meet the particularized injury-in-fact requirements of Article III. And because their claims rest on a pre-existing suspension that simply kept in place a longstanding agency practice, they are not redressable by the relief sought or traceable to the 2015 rulemaking.

**1. Plaintiffs have not established concrete or particularized injury-in-fact**

Plaintiffs' members assert harms that are far too speculative and generalized to support Article III standing. In their response brief, plaintiffs direct the Court to the member declarations of Mr. Angstman and Mr. Dewitt, who express concerns with proposals to construct WTS on certain project sites. Dkt. 83, at 6-7. But their members lack concrete and personalized interest in those sites.

Mr. Angstman is concerned that the proposed Donlin Gold Mine Project will impound portions of tributaries of Crooked Creek for use in a WTS to treat effluent in waters on site "before it is discharged into waters outside of the Project area." *Id.* at 6. Plaintiffs initially pointed to purely speculative effects on downstream waters as the basis for Mr. Angstrom's standing, and still claim that those supposed risks are "highly relevant." *Id*. But they plainly are not. The idea that the Donlin WTS might *fail to "perform as intended"* (Dkt. 67-3, at ¶ 10) and that this imagined failure might impact waters 250 miles downstream is unsupported by any record evidence. Dkt. 72, at 13. Far from it, the record shows that the proposed features at Donlin underwent "exhaustive review" to prevent the types of damage Mr. Angstman speculates about before the Corps issued a Section

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

404 permit for its construction. Dkt. 76, at 2. The Corps concluded that:

> (1) the approved plan was the least environmentally damaging practicable alternative, (2) that no discharges would violate State or federal water quality standards or jeopardize endangered or threatened specifies or their habitat, and (3) that, with mitigation measures … the discharge of dredged or fill material would not cause or contribute to significant degradation of waters of the United States.

*Id.* Mr. Angstman's unfounded speculation that the proposed Donlin WTS might harm water quality 250 miles downstream does not support standing. Dkt. 72, at 13. Furthermore, if Mr. Angstman had any actual basis to believe that, despite Corps review, the Donlin WTS might fail, his obvious remedy would be to challenge the site's Section 404 permit—which he does not allege he has done, undermining his claims to have been harmed.

Accordingly, plaintiffs now change tack and claim that Mr. Angstman's "primary" harm is instead the potential impoundment of waters "*inside* the project area" that allegedly will harm "American Creek and Lewis Gulch," which are minor tributaries of the larger Crooked Creek watershed and Kuskokwim River. Dkt. 83, at 6. But plaintiffs fail to explain how this would result in any injury to Mr. Angstman, who has not recently visited the proposed site, has asserted no plans to do so, and only asserts "recreational and aesthetic interests" in waters of Kuskokwim River many miles downstream. Dkt. 67-3, at ¶ 6; Dkt. 83, at 6. Without that showing, Mr. Angstman cannot satisfy the requirement that he demonstrate with "specific facts" that are imminent and not conjectural that he "use[s] the affected area" such that his "enjoyment of [that] environment 'will be lessened.'" *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183-84 (2000); see also *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Mr. DeWitt's concern with an existing permit for the Hecla Grouse Creek mine site and its impact on Pinyon Creek is of no more help in establishing plaintiffs' standing. Plaintiffs assert that Mr. DeWitt is harmed because the Hecla permit only requires compliance with water quality effluent limitations where Pinyon empties into Jordan Creek, and not in the portions of Pinyon Creek

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

incorporated in a WTS. Dkt. 83, at 7. But they still have no answer for the fact that Mr. DeWitt does not recreate in Pinyon Creek (a feature that has been permanently dewatered (Dkt. 73-13, at 31)), or demonstrate any personalized connection to it. Nor do plaintiffs explain how continued use of parts of Pinyon Creek in a WTS to treat water prior to its discharge into Jordan Creek could impact Mr. DeWitt's enjoyment of any part of the Salmon River watershed. Dkt. 67-6, at ¶ 8. The permit for Hecla was originally issued decades ago, in October 1992, and since then Jordan Creek has been the "receiving water" for treated waters. As Mr. DeWitt concedes, EPA has "require[d] compliance with technology-based effluent limitations … where Pinyon Creek empties into Jordan Creek," ensuring the cleanliness of downstream water. Dkt. 67-6, at ¶ 14. Mr. DeWitt has established no concrete, personalized injury arising from the WTS at Pinyon Creek or downstream.

Mr. DeWitt's separate concern with Midas Gold's proposed Stibnite Gold Project (SGP) does not give rise to any personalized harm either. To begin with the most basic flaw, a company executive has told this Court that "nowhere in the proposed water treatment program for SGP is there any design accommodation for, or reliance by Midas Gold on, the Waste Treatment System Exclusion." Dkt. 74, at ¶ 15. Plaintiffs' new assertion that the "Plan of Restoration and Operations for the Site shows portions of two creeks may be used in a WTS" (Dkt. 83, at 8 n.2) is an insufficient response. Plaintiffs do not show that those creeks are WOTUS and merely speculate that they "may" be part of a WTS, which is insufficient to counter the company's plain statement. In fact, the publicly-available PRO shows both creeks will be re-routed during operations and restored following closure of the mine, pursuant to Section 404 permits, and will not become part of a WTS. *See* PRO at 8-13 and App. F, http://midasgoldidaho.com/stibnite-project/#. Finally, Mr. DeWitt does not even claim to recreate in waters that "may" be impounded into a WTS on this site. He has not established any injury sufficient to satisfy standing requirements.

**2. Plaintiffs' asserted injuries are not actual or imminent**

Plaintiffs concede that they do not know whether or to what extent either the Donlin or Midas

Tupper Mack Wells PLLC
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

projects rely on the suspension of the limiting language in the WTS exclusion to impound otherwise jurisdictional waters into waste treatment systems. Dkt. 83, at 8. They argue that their purported injuries are sufficiently imminent nonetheless by suggesting that (1) their lack of knowledge as to whether the WTS exclusion will be invoked at all or applied in a way that causes them damage "is not determinative" and (2) the plans for proposed sites are "sufficiently well developed to be the subject of public notice and permitting review." Dkt. 83, at 8-9. Neither argument remedies the speculative nature of the plaintiffs' purported harms.

To establish standing on summary judgment, plaintiffs cannot point to a lack of evidence. They must "'set forth' by affidavit or other evidence 'specific facts'" showing they possess standing. *Clapper v. Amnesty Int'l*, 568 U.S. 398, 410-12 (2013). Guesswork is not a basis for standing.

It makes no difference that the sites plaintiffs identify advanced through *some* of the required permitting process to start construction. Dkt. 83, at 3. That progress does not cure the lack of showing of imminent injury: project features at the sites plaintiffs identify will not come into existence or operation for many years. *See* Dkt. 76, at ¶¶ 5, 10-12 ("there is no possibility that construction of the [Donlin] dam facilities … could occur before [2020]").

Nor does plaintiffs' half-hearted attempt to develop direct organizational standing do the trick. First, plaintiffs do not explain how their organizational missions could become more difficult because the exact regime regarding the WTS exclusion that has been in place since 1980 remains in place until another rulemaking is complete, likely later this year. And plaintiffs' organizational standing relies on nothing but "vague, generalized grievances" including "pollution and habitat loss" (Dkt. 67-5, at ¶ 15), "the cumulative effect of pollution" (Dkt. 67-7, at ¶¶ 2,13), and concern with water quality "across the U.S." Dkt. 67-4, at ¶ 12. Those generalities are textbook examples of broad concerns suffered "by all or a large class of citizens" that are not sufficiently particularized for Article III standing. *Warth v. Seldin*, 422 U.S. 490, 499 (1975).

**3. Plaintiffs have not established either causation or redressability**

Plaintiffs attempt to salvage causation and redressability by arguing that their harms stem from

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

the agencies "permanently codifying the expanded [WTS] exclusion" without notice and comment. Dkt. 83, at 10. Specifically, plaintiffs argue that their members suffered a *procedural* harm because they were denied the opportunity to press for a narrower exclusion in the 2015 rulemaking. *Id.* But it is clear law that a purported procedural violation does not overcome the failure to plead injury-in-fact. *See Summers v. Earth Island Inst*. 555 U.S. 488, 496 ("deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing"). Plaintiffs do not satisfy that requirement.

Re-casting plaintiffs' injuries as "procedural" also fails because plaintiffs were denied no procedural right. The 2015 rulemaking did not involve the substance of the WTS exclusion. To the contrary, the agencies repeatedly stated that they were not undertaking substantive review of the exclusion. *See* Dkt. 79, at 1 (citing six such instances during the rulemaking). Thus, a narrower exclusion was not a "possible" outcome of the 2015 rulemaking. Dkt. 83, at 10. The rulemaking was a matter entirely separate and completely unconnected from plaintiffs' asserted injuries, which would be the same whether or not the 2015 rulemaking took place.

Another overarching problem with plaintiffs' suit is that the relief plaintiffs seek would not make them "better off." Dkt. 83, at 11. First, plaintiffs admit that vacatur of the exclusion provision in the 2015 Rule would not afford them relief, because the law would simply revert to same decades-long regime that the 2015 rule continued. *Id.* at 11. Second, the entire 2015 Rule has been enjoined for much of its existence, and remains enjoined at the location of each mine site to which plaintiffs point. Dkt. 72, at 14-15. Third, the plaintiffs seek only an injunction *going forward*—which would not impact any of the mine sites they identify. The Hecla site's permits were issued long before 2015. Continued suspension of the limiting language in the 2015 Rule did not impact it. The Donlin site has received its Section 404 permit. And the proposed Stibnite Gold Project has no link to the continued suspension of the limiting language in the WTS exclusion because there is no "design accommodation for, or reliance by Midas Gold on, the Waste Treatment System Exclusion." Dkt. 74, at ¶15. Plaintiffs' summary judgment motion should be denied, and the suit

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

dismissed, because plaintiffs lack Article III standing.

**B. This action is untimely**

Plaintiffs contend that they appropriately brought a challenge in 2015 to the scope of the WTS exclusion because the agencies in the 2015 Rule "for the first time ever" "codified" an exclusion that extends to systems built in jurisdictional waters. Dkt. 83, at 3. But EPA's adoption of an exclusion with a suspension on the limiting language occurred in 1980, not 2015. That suspension—and the current scope of the WTS exclusion—has continued in place for decades, repeatedly recognized in further agency action and in judicial decisions. *See* Dkt. 72, at 4-7. It was thus decades ago that the agencies "flouted" any alleged promise to "promptly" revise the WTS exclusion through notice and comment. Dkt. 72, at 17. And as plaintiffs themselves point out, federal courts regularly review "even temporary suspensions or delays" that impact legal rights. Dkt. 67, at 10. There is therefore no chance at all that denial of review here would create a "template for any federal agency to make end-runs around mandatory public participation requirements through the subterfuge of a temporary un-promulgated action." Dkt. 83, at 1. Any such subterfuge can be challenged within six years after it occurs.

Plaintiffs cannot plausibly assert that the 2015 Rule—which made only technical and non-substantive changes in the exclusion, after the agencies made clear that they would not consider substantive changes—was the true consummation of the rulemaking process regarding the substance of the WTS exclusion. Nor can they pretend that the many earlier agency statements of the exclusion were not final agency action because EPA stated an intent to "promptly" consider the exclusion further. Those arguments ignore both the ordinary meaning of "promptly"—the time for which expired long ago—and that courts regularly review even temporary acts as substantive rule-makings. *See* Dkt. 72, at 17-18. The six year statute of limitations for challenging the scope of the exclusion expired long before this suit was filed and was not re-triggered by 2015's non-substantive changes, especially given the agencies' intent not to reopen the exclusion for consideration.

Plaintiffs' suggestion that the agencies were not acting on a settled regulatory backdrop with

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

regard to the WTS exclusion is wrong. The 1986 EPA document plaintiffs cite (Dkt. 84-2), which is RCRA-focused, does not address the agencies' practice of exempting waters under the WTS exclusion that are properly permitted under Section 404 or that predated Section 404. *See* Dkt. 84-2, at 10. The business intervenors, by contrast, have documented decades of consistent agency practice applying the WTS exclusion to waters impounded into a WTS as permitted under Section 404 or otherwise consistent with prior law. Dkt. 72, at 6-7.

Nor are plaintiffs correct when they contend that the 2015 Rule was the first "codification" of the current scope of the exclusion. In 1984, EPA issued a proposed WTS exclusion from the definition of waters of the United States for the purposes of Section 404, which included neither the limiting language nor the suspension. 49 Fed. Reg. 39012, 39018 ("waste treatment systems . . . are not waters of the United States"). That proposal was finalized in 1988 following notice and comment. 53 Fed. Reg. 20764, 20764. Similarly, the Corps published a definition of waters of the United States in 1986 that included a straightforward WTS exclusion. 51 Fed. Reg. 41206, 41250. Agency practice was anything but unsettled or informal.

Plaintiffs are correct that the 2015 Rule was a final agency action, but it was final agency action as to ministerial changes to the WTS exclusion. Dkt. 83, at 4. Making ministerial tweaks to the WTS exclusion, while explaining repeatedly that the agencies were not revisiting the scope of the exclusion, did not open the substance of the exclusion to challenge. Such issues were beyond the scope of the rulemaking, which with regard to the WTS maintained the status quo. Dkt. 72, at 17.

Not one of the cases plaintiffs cite supports the proposition that it is timely to challenge a rule that makes ministerial changes in a decades old agency position without altering or even considering the substance of the rule. *See City of Chicago v. United States*, 396 U.S. 162, 166 (1969) (decision of ICC to discontinue an investigation, after ICC triggered its statutory mandate by initiating the investigation, was reviewable); *Havasupai Tribe v. Povencio*, 906 F.3d 1155, 1162 (9th Cir. 2018), *cert. denied*, No. 18-1239, 2019 WL 1331355 (U.S. May 20, 2019) (U.S. Forest Service's conclusion that company had valid existing mining rights qualified as recognition of a claim

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

and was therefore reviewable as a final agency action); *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 990 (9th Cir. 2006) (Forest Service annual operating instructions were reviewable final agency acts as site-specific actions from which binding legal obligations flowed).

Finally, plaintiffs provide no answer to the likelihood that new rulemakings will soon render this action moot. In fact, plaintiffs have commented on the proposed 2019 WOTUS rule, raising the same arguments for the agencies' consideration that they place before the court here. Dkt. 73-12, at 45. Especially under these circumstances, there is no justification to upset reliance interests and provoke a massive shift in the status quo that has been in place since 1979. To consider plaintiffs' claims at this point, outside the APA statute of limitations and with new rules pending, would be a waste of judicial resources. *See* Dkt. 72, at 18.

**C. The Waste Treatment System Exclusion is lawful**

**1. The WTS Exclusion is fully consistent with the CWA**

Plaintiffs argue that the WTS exclusion, because it no longer contains the long-suspended limitation for systems created in or by impounding a WOTUS, is "irreconcilable" with the CWA's "categorical prohibition" against discharges into WOTUS absent a permit. Dkt. 83, at 1. But the WTS exclusion as it has been in place since 1980 has never shielded discharges from all applicable permit requirements. To construct a WTS in a WOTUS, the treatment system operator will have to obtain a Section 404 permit, which the CWA requires for discharges of dredged or fill material. And the Corps does not grant such permits lightly. As we described, the Section 404 permitting process requires a showing that there is no practicable alternative to constructing the WTS in a WOTUS with less adverse impacts. Dkt. 72, at 1. In addition, the operator of a WTS must obtain and comply with a Section 402 permit for any discharge from the WTS into a WOTUS.

Plaintiffs dismiss Sections 404 and 402 as "specific and narrow exceptions" to a no-discharge rule. Dkt. 83, at 2. That is a strange description of these key elements of the CWA scheme, but in any event is no response here, because these statutory permitting schemes are routinely applied to WTS to protect the Nation's waters. And Section 404 gives the Corps the authority to permit filling

Tupper Mack Wells PLLC
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

a WOTUS in its entirety, thereby removing the water from jurisdiction completely. It logically follows that the agencies have discretion to define WOTUS to exclude waters used to construct a WTS in order to protect downstream water quality. Dkt. 72, at 19; Dkt. 73-9, at 68 n.2; Dkt. 79, at 24. Plaintiffs have no answer to the fact that the CWA allows the agencies to issue permits for the construction of and discharges from WTSs.

Plaintiffs do not even attempt to take on the other textual and structural factors which show that the WTS exclusion is both reasonable and within the statutory authority of the agencies to define "waters of the United States." As we explained, the sweeping logic of plaintiffs' argument that "the authority to interpret" WOTUS does not include the authority to define by exclusions would invalidate multiple exclusions central to the CWA scheme. Dkt. 72, at 19; *cf. Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 319 (2014) (EPA can exclude substances from the term "air pollutant" that defines Clean Air Act jurisdiction when inclusion would be "inconsistent with the statutory scheme" and they "could not sensibly be encompassed within the particular regulatory program"). And because Congress has legislated since 1979 against the backdrop that WTS are excluded from the definition of WOTUS, Congress is assumed to have ratified the exclusion. *Id.* Further, treating a WTS as a WOTUS would foster intractable conflicts with other CWA programs, including imposing CWA Section 303 requirements for specifying designated uses of a WOTUS on WTSs, and disrupting NPDES and state regulatory permits that assume waters are treated *within* a WTS rather than *before* water enters the WTS. Dkt. 72, at 20. Finally, plaintiffs largely ignore that the Fourth Circuit in *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 214 (4th Cir. 2009), determined that the Corps reasonably interpreted WOTUS to exclude stream segments that linked valley fills to sediment ponds, and the ponds themselves, because such features are non-jurisdictional waste treatment systems.

Plaintiffs respond to none of these points that show the WTS exclusion comports with the text and structure of the CWA. Instead, plaintiffs fall back on asserting that the exclusion clashes with the Act's "purpose." Dkt. 83, at 2. But the WTS exclusion is exactly in line with the Act's purpose.

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

Waste treatment systems, which may incorporate features that would otherwise qualify as WOTUS, function to protect water quality adjacent to and downstream of industrial operations. Dkt. 72, at 8. They treat water to ensure that water discharged from the WTS complies with water quality standards—or process the water for reuse on site to eliminate the need for such a discharge at all. *Id.* at 23. They are sometimes the only technologically and economically feasible manner to treat discharges from industrial operations. Dkt. 78, at ¶¶ 7-8. As a result, far from undermining the Act's purpose, the WTS exclusion is essential to achieving its goals.

**2. The 2015 Rule's WTS Exclusion is procedurally sound**

Plaintiffs assert that the WTS is arbitrary and capricious because the agencies did not explain a "shift" from the agency's one-time position that only manmade waste treatment systems should fall into the exclusion. Dkt. 67, at 8. They fail to acknowledge that the agency held that position for only two months in 1980, almost immediately declared it a mistake, and held it neither before nor since. And of course there was no "shift" in 2015. The agencies have excluded WTSs, including those created in jurisdictional waters, for four decades. They had no obligation to explain policy decisions long-past that they expressly stated they were not reopening. *See* Dkt. 72, at 21.

Plaintiffs also do not defend their assertion that the agencies failed to comply with notice and comment rulemaking procedures in rendering a "temporary" suspension "permanent." Dkt. 67, at 15. As the business intervenors have explained, calling the suspension "temporary" is a charade: it has been in place for 40 years. The agencies determined in the 2015 rulemaking to maintain the same WTS exclusion that had been in place since that time and had no obligation to take notice and comment on its substance. Dkt. 72, at 22.

**D. Plaintiffs improperly ask this Court to substitute plaintiffs' judgment for that of the agencies, to the detriment of the Nation's waters and economy**

We have detailed why the WTS exclusion, including the suspension of its limitation, has been and remains vital to industry and to protecting the Nation's waters. Dkt. 72, at 23-24. Without it, industry would nonsensically have to treat water before it is discharged to a WTS—at minimum a

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

costly waste of resources, and often something that is not feasible at all. And without it, essential methods of treating water before it is released or reused—methods often deemed "best management practices" by EPA—would be lost. *Id.* And this is to say nothing about upsetting the settled expectations of businesses that have relied on the WTS exclusion in its current form for decades.

Plaintiffs simply ignore these very real practical harms. This Court should not enjoin an exclusion from WOTUS that is consistent with the CWA, well within the authority of the expert agencies, and that has served the public good for 40 years. Still less should it do so in a case where mootness is imminent, at the behest of plaintiffs with no concrete injury, who failed to challenge the exclusion within the statute of limitations, and who are now fully engaged on exactly the same issue in connection with a proposed new rule for which the agencies actually do seek substantive comment on the exclusion.

## CONCLUSION

Plaintiffs' motion for summary judgment should be denied, and the intervenor-defendants' cross motion granted. Judgment should be entered for the intervenor-defendants.

Dated this 27th day of June, 2019.

TUPPER MACK WELLS PLLC

/s/ James A. Tupper, Jr.
James A. Tupper, Jr., WSBA No. 16873
2025 First Avenue, Suite 1100
Seattle, WA 98121
(206) 493-2300
tupper@tmw-law.com

/s/ Lynne M. Cohee
Lynne M. Cohee, WSBA No. 18496
2025 First Avenue, Suite 1100
Seattle, WA 98121
(206) 493-2300
cohee@tmw-law.com

INTERVENORS' REPLY IN SUPPORT OF
THEIR CROSS MOTION
CASE NO. 2:15-CV-01342-JCC

12

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

MAYER BROWN LLP

s/ Timothy S. Bishop

Timothy S. Bishop*
1999 K Street NW
Washington, DC 20006
(202) 263-3000
tbishop@mayerbrown.com

*Attorneys for Intervenor-Defendants*
*Pro hac vice

INTERVENORS' REPLY IN SUPPORT OF THEIR CROSS MOTION
CASE NO. 2:15-CV-01342-JCC

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300 FAX 206.493.2310

CERTIFICATE OF SERVICE

I hereby certify that on this date, I filed and thereby caused the foregoing document to be served via the CM/ECF system in the United States District Court of the Western District of Washington on all parties registered for CM/ECF in the above-captioned matter.

Dated at Seattle, Washington, this 27th day of June, 2019.

        s/ James A. Tupper, Jr.
James A. Tupper, Jr., WSBA No. 16873

INTERVENORS' REPLY IN SUPPORT OF
THEIR CROSS MOTION
CASE NO. 2:15-CV-01342-JCC

**Tupper Mack Wells PLLC**
2025 First Avenue
Suite 1100
Seattle, Washington 98121
TEL 206.493.2300  FAX 206.493.2310